Adam J. Friedman, Esq.
Friedman Vartolo LLP
950 Third Avenue, 11th Floor,
New York, New York 10022
Attorney for SRMOF 2009-1 Trust
P: (212) 471-5199
AFriedman@FriedmanVartolo.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------------X

|  | : |  |
|---|---|---|
| IN RE: | : | CASE NO.: 15-26661 |
|  | : |  |
| Caprice Ladson, | : | CHAPTER: 13 |
|  | : |  |
| Debtor | : | HON. JUDGE.: |
|  | : | STACEY L. MEISEL |
|  | : |  |
| Debtor(s) | : | HEARING DATE: May 25, 2016 at 10:30 a.m. |
|  | : |  |
|  | : |  |
|  | : |  |

-----------------------------------------------------------------X

## NOTICE OF MOTION FOR RELIEF FROM AUTOMATIC STAY

**PLEASE TAKE NOTICE**, that upon the application of SRMOF 2009-1 Trust , the undersigned shall move this Court for an Order, pursuant to 11 U.S.C. 362(d), vacating the automatic stay to permit movant, its successors and/or assigns, to enforce its mortgage on the Debtor's/Debtors' premises located at 688 Sheridan Ave, Plainfield, NJ 07060 and for such other and further relief as is just and proper.

This motion shall be heard at the United States Bankruptcy Court, District of New Jersey, US Bankruptcy Court, District of New Jersey, 50 Walnut Street, 3rd Floor, Courtroom 3A Newark, NJ 07102 on May 25, 2016 at 10:30 a.m. or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE**, that answering affidavits, if any, must be served so as to be received not later than seven (7) days before the return date of this motion.

Dated: New York, NY

April 29, 2016

By: /s/ Adam J. Friedman
Adam J. Friedman, Esq.
FRIEDMAN VARTOLO LLP
Attorneys for SRMOF 2009-1 Trust
950 Third Avenue, 11th Floor
New York, New York 10022
T: (212) 471-5100
F: (212) 471-5150

To:

Caprice Ladson
688 Sheridan Ave
Plainfield, NJ 07060
**Debtor**

Donald C. Goins
323 Washington Avenue
Elizabeth, NJ 07202
**Attorney for Debtor**

Marie-Ann Greenberg
30 Two Bridges Rd
Suite 330
Fairfield, NJ 07004
**Trustee**

Adam J. Friedman, Esq.
Friedman Vartolo LLP
950 Third Avenue, 11th Floor,
New York, New York 10022
Attorney for SRMOF 2009-1 Trust
P: (212) 471-5199
AFriedman@FriedmanVartolo.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------------X

|  |  |  |
|---|---|---|
|  | : |  |
| IN RE: | : | CASE NO.: 15-26661 |
|  | : |  |
| Caprice Ladson, | : | CHAPTER: 13 |
|  | : |  |
| Debtor | : | HON. JUDGE.: STACEY L. |
|  | : | MEISEL |
|  | : |  |
|  | : | HEARING DATE: May 25, 2016 at |
|  | : | 10:30 a.m. |
|  | : |  |
|  | : |  |

-----------------------------------------------------------------X

## MOTION FOR RELIEF FROM THE
## AUTOMATIC STAY REGARDING REAL PROPERTY

SRMOF 2009-1 Trust ("Movant") hereby moves this Court, pursuant to 11 U.S.C. 362(d), for relief from the automatic stay with respect to certain real property of the Debtor having an address of 688 Sheridan Ave, Plainfield, NJ 07060, (the "Property"), for all purposes allowed by law, the Note (defined below), the Mortgage (defined below), and applicable law, including but not limited to the right to foreclose. In support of this Motion, Movant respectfully states:

### FACTUAL HISTORY

1.     A Petition under Chapter 13 of the United States Bankruptcy Code was filed with respect to the Debtor on 09/01/2015.

2.      The Debtor has executed and delivered or is otherwise obligated with respect to that certain promissory note in the original principal amount of $251,200.00  (the "Note"). A copy of the Note is attached hereto as **Exhibit A**.

3.      Pursuant to the certain Mortgage (the "Mortgage"), all obligations (collectively, the "Obligations") of the Debtor under and with respect to the Note and Mortgage are secured by the Property. A copy of the Mortgage is attached hereto as **Exhibit B**.

4.      All rights and remedies under the Mortgage have been assigned to the Movant pursuant to that certain assignment of Mortgage, a copy of which is attached hereto as **Exhibit C**.

5.      In addition to the other amounts due to Movant reflected in this Motion, as of the date hereof, in connection with seeking the relief requested in this Motion, Movant has also incurred $800.00 in legal fees and $176.00 in filing costs.

6.      The Loan is contractually due for December 1, 2010.

7.      As of April 26, 2016, the outstanding amount of the Obligations less any partial payments or suspense balance is $367,441.17. *See Certifications of Creditor Regarding Calculations and Post Petition Payments* as Composite **Exhibit D**. The estimated market value of the Property is $250,000.00 as of March 24, 2016. A BPO attached hereto as **Exhibit E**.

8.      In addition, since the petition date the debtor has failed to make any post-petition payments to the Movant and is currently in arrears. As is outlined on the attached Worksheet the Debtor has 5 payments that have come due since the petition was filed on September 1, 2015. *See* **Exhibit D**. As of the date of the instant motion, said default has not been cured.

## LEGAL ARGUMENT

9.      Pursuant to 11 U.S.C. §362 (d), the court shall enter an order granting a secured creditor relief from the automatic stay:

a.      For cause pursuant to §362 (d)(1), "including the lack of adequate protection of an interest in property of such party and interest"; and

b.      Where the debtor does not have equity in said property and the property is not necessary for an effective reorganization (*See* §362 (d)(2)(A) and (B))

10.     Courts have held that cause for the granting of relief from an automatic stay exists where the secured creditor can show a lack of protection or equity in the mortgaged premises and that the moving party carries the burden of proof in this regard. In Re Roxrun Estates, Inc. 74 B.Y. 997, 1003 (Bankr. S.D.N.Y. 1987). Courts have consistently held that where the secured party can show that liens on the property exceed the fair market value of the property, the secured creditor will have met this burden.

11.     As is explained above, the fair market value of the property is $250,000.00 and the total amount owed the movant is $367,441.17. It is, therefore, clear that there is no equity in the mortgaged premises and an order granting relief from the automatic stay should be entered pursuant to §362 (d)(2)(A).

12.     With respect to the necessity of the property for reorganization, the Debtor carries the burden that there is a "reasonable probability that it will be able to propose a plan that will result in a successful reorganization within a reasonable time." In Re Ronald D. Saypol, 31 B.R. 796, 803 (Bankr S.D.N.Y 1983).

13.     On February 1, 2016, an order confirming the Chapter 13 plan was entered. See attached copy of the entered order as **Exhibit F**.

14.     In paragraph 2 of that order, the court required the debtor to apply and potentially complete a loan modification by no later than April 21, 2016.

15.     As of April 29, 2016, the Debtor still has not submitted a loan modification packet for the movant's consideration.

16.     Therefore, given the lack of effort on the part of the Debtor, it is increasingly likely that the Debtor will not be able to complete their plan in a reasonable amount of time.

17.     Further, courts have found cause for the granting of relief from an automatic stay where the debtor has failed to make post-petition mortgage payments as they become due. In Re Michael Lancelot Taylor, 151 B.R. 646,648 (Bankr. E.D.N.Y. 1993).

18.     The Debtor has missed 5 post-petition payments of $2,252.40 (less suspense amount of $1,642.80) that have come due from January 1, 2016 till May 1, 2016. As a result, the Debtor currently has a post-petition arrearage of $9619.20. See **Exhibit D**. Accordingly, an order granting the movant relief form the stay should be granted pursuant to §362 (d)(1).

19.     Oral argument is waived.

**WHEREFORE**, Movant prays that this Court issue an Order terminating or modifying the stay and granting the following:

1.    Relief from the stay for all purposes allowed by law, the Note, the Mortgage and applicable law, including but not limited to allowing Movant and any successor or assigns to proceed under applicable non-bankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property.

2.    That the Order be binding and effective despite any conversion of this bankruptcy case to another case under any other chapter of Title 11 of the United States Code.

3.    (All other Clients) That the Order permit activity necessary to obtain possession of the premises located at 688 Sheridan Ave Plainfield, NJ 07060 and that the Movant is therefore permitted to engage in loss mitigation activity, including short payoff, short sale, and the obtaining of a deed in lieu of foreclosure, including authorization to negotiate inferior liens, and is further permitted to send information regarding these loss mitigation options directly to the debtor.

4.    That the 14 day stay imposed under 11 U.S.C. waived and shall not apply to the Movant's interest in 688 Sheridan Ave Plainfield, NJ 07060.

5.    For such other relief as the Court deems proper.

Dated: New York, NY
       April 29, 2016

By: /s/ Adam J. Friedman
Adam J. Friedman, Esq.
FRIEDMAN VARTOLO LLP
Attorneys for SRMOF 2009-1 Trust
950 Third Avenue, 11th Floor
New York, New York 10022
T: (212) 471-5100
F: (212) 471-5150

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-2(c) | |
| Adam J. Friedman, Esq.<br>Friedman Vartolo LLP<br>950 Third Avenue, 11th Floor,<br>New York, New York 10022<br>Attorney for SRMOF 2009-1 Trust<br>P: (212) 471-5100<br>AFriedman@FriedmanVartolo.com | Case No. 15-26661<br><br>Hearing Date:<br><br>Judge: Stacey L. Meisel<br><br>Chapter: 13 |
| IN RE:<br><br>Caprice Ladson,<br><br>Debtor | |

Recommended Local Form:      [ ] Followed      [ ] Modified

**ORDER VACATING STAY**

The relief set forth on the following page is hereby **ORDERED**.

—

Upon the motion of SRMOF 2009-1 Trust , under Bankruptcy Code section 362(a) for relief from the automatic stay as to certain property as hereinafter set forth, and for cause shown, it is

**ORDERED** that the automatic stay is vacated to permit the movant to institute or resume and prosecute to conclusion one or more actions in the court(s) of appropriate jurisdiction to pursue the movant's rights in the following:

[x] Real property more fully described as: 688 Sheridan Ave, Plainfield, NJ 07060

[  ] Personal property more fully described as: N/A

It is further **ORDERED** that the movant may join the debtor and any trustee appointed in this case as defendants in its action(s) irrespective of any conversation to any other chapter of the Bankruptcy Code; and it is further

**ORDERED**, that the stay afforded by 11 U.S.C. §362(a) be, and is hereby, modified to permit SRMOF 2009-1 Trust , it's successors and/or assigns, to pursue its rights under applicable state law with respect to the premises located at 688 Sheridan Ave, Plainfield, NJ 07060; and it is further

**ORDERED**, that this Relief Order permits activity necessary to obtain possession of the premises located at 688 Sheridan Ave, Plainfield, NJ 07060 and that SRMOF 2009-1 Trust is therefore permitted to engage in loss mitigation activity, including short payoff, short sale, and the obtaining of a deed in lieu of foreclosure, including authorization to negotiate inferior liens, and is further permitted to send information regarding these loss mitigation options directly to the debtor; and it is further

**ORDERED**, that the 14 day stay imposed under 11 U.S.C. §362(a) is waived and shall not apply to SRMOF 2009-1 Trust 's interest in 688 Sheridan Ave, Plainfield, NJ 07060; and it is further

**ORDERED**, that the instant order is binding in the event of a conversion; and it is further

**ORDERED**, that the trustee be informed of any surplus monies resulting from the sale of the collateral.

**ORDERED**, that the movant shall serve this order on the debtor, any trustee, and any other party who entered an appearance on the motion.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

Adam J. Friedman, Esq.
Friedman Vartolo LLP
950 Third Avenue, 11th Floor,
New York, New York 10022
Attorney for SRMOF 2009-1 Trust
P: (212) 471-5199
AFriedman@FriedmanVartolo.com

| | |
|---|---|
| In Re: | Case No.: 15-26661 |
| | Chapter: 13 |
| Caprice Ladson | Hearing Date: 5/25/16 at 10:30 |
| | Judge: Stacey L. Meisel |

### CERTIFICATION REGARDING CALCULATION OF AMOUNT DUE
#### (NOTE AND MORTGAGE DATED ___March 23, 2005___ )

___Irisa Staggers___ of full age, employed as __Bankruptcy Manager__

by ___Selene Finance LP___ , hereby certifies the following:

Recorded on __4/19/2005__ , in ___Union___ County, in Book __11122__ at Page __501__

Property Address: 684-688 Sheridan Avenue, Plainfield, NJ 07060-2237

Mortgage Holder: SRMOF 2009-1 Trust

#### 1. PAYOFF STATEMENT

| | | |
|---|---|---|
| Unpaid Principal Balance: | $ | 248,968.47 |
| Accrued interest from __10/1/10__ to __4/1/16__ : | $ | 45,519.20 |
| (Interest rate = ____ % per year; $ ____ per day x ____ days) | | |
| Unearned interest from ____ to ____ : | $ | 0.00 |
| Per diem interest from ____ to ____ : | $ | 0.00 |
| Late Charges from ____ to ____ ($ ____ /mo. x ____ mos.): | $ | 223.38 |
| Attorney's fees and costs as of ____ : | $ | 0.00 |

Advances through _____4/26/16_____ for:

| | | |
|---|---|---|
| Real Estate Taxes: | $ | 65,434.03 |
| Insurance premiums: | $ | 0.00 |
| Other: | $ | 0.00 |
| *Sub-Total of Advances*: | $ | 65,434.03 |
| Less Escrow Monies: | ($ | 2,920.40) |
| *Net Advances:* | $ | 62,513.62 |

| | | |
|---|---|---|
| Interest on advances from _____ to _____: | $ | 0.00 |
| Other charges (specify ___Recoverable Balance___): | $ | 10,216.50 |
| Less unearned interest: | ($ | 0.00) |

**TOTAL DUE AS OF** _____4/26/16_____ :      $    367,441.17

**Date of last payment:** _____4/19/16_____

## II. EQUITY ANALYSIS (When appropriate)

Estimated fair market value of real estate as of _____3/24/16_____ :    $    250,000.00*

*Source: _____BPO from 3/24/16_____ (e.g. appraisal, tax bill/assessment, contract of sale, debtor's schedules, etc.)

Liens on the real estate:

| | | |
|---|---|---|
| 1. Real estate taxes as of _____: | $ | 0.00 |
| 2. First Mortgage (principal and interest), as of _____: | $ | 294,487.67 |
| 3. Second Mortgage (principal and interest), as of _____: | $ | 0.00 |
| 4. Other (specify on separate exhibit): | $ | 0.00 |
| **TOTAL LIENS :** | ($ | 294,487.67) |

**APPARENT EQUITY AS OF** _____4/26/16_____ :    $    0.00 **

** If negative, insert zero (0).

I certify under penalty of perjury that the above is true.

Date: ___5/2/2016___

Signature    **Irisa Staggers**

*rev. 8/1/15*

Caption in Compliance with D.N.J. LBR 9004-1(b)

Adam J. Friedman, Esq.
Friedman Vartolo LLP
950 Third Avenue, 11th Floor,
New York, New York 10022
Attorney for SRMOF 2009-1 Trust
P: (212) 471-5199
AFriedman@FriedmanVartolo.com

| | |
|---|---|
| In Re: | Case No.: 15-26661 |
| | Chapter: 13 |
| Caprice Ladson | Hearing Date: May 25, 2016 at 10:30 a.m. |
| | Judge: Stacey L. Meisel |

## CERTIFICATION OF CREDITOR REGARDING POST PETITION PAYMENT HISTORY
### ( NOTE AND MORTGAGE DATED March 23, 2005 )

__Irisa Staggers__ , employed as __Bankruptcy Manager__ by

_____Selene Finance LP_____ , hereby certifies the following:

Recorded on 4/19/2005 , in Union County, in Book 11122 at Page 501

Property Address: 684-688 Sheridan Avenue, Plainfield, NJ 07060-2237

Mortgage Holder: SRMOF 2009-1 Trust

Mortgagor(s)/ Debtor(s): Caprice Ladson and Chibueze C. Obi

POST-PETITION PAYMENTS (Petition filed on 9/1/2015 )

| | Amount Due | Date Payment Was Due | How Payment Was Applied (Mo./Yr.) | Amount Received | Date Payment Received | Check or Money Order Number |
|---|---|---|---|---|---|---|
| 1. | $ 2,252.40 | 10/1 | | $ 2,252.40 | 12/10/15 | |
| 2. | $ 2,252.40 | 11/1 | | $ 2,252.40 | 3/28/16 | |
| 3. | $ 2,252.40 | 12/1 | | $ 2,252.40 | 4/19/16 | |

| Amount Due | Date Payment Was Due | How Payment Was Applied (Mo./Yr.) | Amount Received | Date Payment Received | Check or Money Order Number |
|---|---|---|---|---|---|
| 4. $ 2,252.40 | 1/1/16 | | $ 0.00 | | |
| 5. $ 2,252.40 | 2/1/16 | | $ 0.00 | | |
| 6. $ 2,252.40 | 3/1/16 | | $ 0.00 | | |
| 7. $ 2,252.40 | 4/1/16 | | $ 0.00 | | |
| 8. $ 2,252.40 | 5/1/16 | | $ 0.00 | | |
| 9. | | | | | |
| 10. | | | | | |
| TOTAL: $ 18,019.20 | | | $ 6,757.20 | | |

[Continue on attached sheets if necessary.]

Monthly payments past due: _____5_____ mos. x $ 2,252.40 _____

(Monthly payment + late charge) = $ 11,262.00 _____ as of _____5/1/16_____ .

Each current monthly payment is comprised of:

| | | |
|---|---|---|
| Principal | $ | 1,334.50 |
| Interest | $ | |
| R.E. Taxes: | $ | 806.65 |
| Insurance: | $ | 110.99 |
| Late Charge: | $ | |
| Other: | $ | (Specify:_____) |
| TOTAL | $ | 2,252.14 |

If the monthly payment has changed during the pendency of the case, please explain (attach separate sheet(s) if necessary): _____

_____

Pre-petition arrears: _____ to _____ ( _____ mos. x $ _____ /mo. = $ 0.00 )

I certify under penalty of perjury that the above is true.

Date: 5/2/2016

See attached Payment History

Signature   Selene Finance LP
Trisa Staggers

rev.8/1/15

2

DEBTORS:     CAPRICE LADSON

CREDITOR: SRMOF 2009-1 TRUST

CASE NO.: 15-26661 TBA
FILING DATE: September 1, 2015

**STATEMENT OF AMOUNT DUE**

**I. PREPETITION ARREARS**

| | | |
|---|---|---|
| MONTHLY | 07/01/2010 - 10/01/2010, 4 months @ $1,279.59 | $5,118.36 |
| MONTHLY | 11/01/2010 - 04/01/2011, 6 months @ $1,902.01 | $11,412.06 |
| MONTHLY | 05/01/2011 - 10/01/2011, 6 months @ $1,694.54 | $10,167.24 |
| MONTHLY | 11/01/2011 - 04/01/2012, 6 months @ $1,487.06 | $8,922.36 |
| MONTHLY | 05/01/2012 - 04/01/2013, 12 months @ $1,357.39 | $16,288.68 |
| MONTHLY | 05/01/2013 - 04/01/2015, 24 months @ $1,305.52 | $31,332.48 |
| MONTHLY | 05/01/2015 - 09/01/2015, 5 months @ $2,069.47 | $10,347.35 |
| Property Inspections | | $432.50 |
| TITLE  UPDATE | | $75.00 |
| Tax/Municipal Search | | $75.00 |
| Tax/Municipal Search | | $25.00 |
| FILING OF COMPLAINT | | $200.00 |
| FILING OF LIS PENDENS | | $40.00 |
| SHERIFF'S DEPOSIT REQUIRED BY COUNTY | | $2,000.00 |
| MOTION FILING COST | | $50.00 |
| Tax/Municipal Search | | $100.00 |
| Escrow shortage or deficiency | | $17,602.88 |
| Uncollected Late charges | | $163.38 |
| Attorney fees | | $2,639.68 |
| Service of Complaint | | $90.00 |
| TOTAL PREPETITION ARREARS | | $117,081.97 |

**II. TOTAL INDEBTEDNESS**

| | |
|---|---|
| Principal Balance | $248,968.47 |
| Interest | $43,374.80 |
| Property Inspections | $432.50 |
| TITLE  UPDATE | $75.00 |
| Tax/Municipal Search | $75.00 |
| Tax/Municipal Search | $25.00 |
| FILING OF COMPLAINT | $200.00 |
| FILING OF LIS PENDENS | $40.00 |
| SHERIFF'S DEPOSIT REQUIRED BY COUNTY | $2,000.00 |
| MOTION FILING COST | $50.00 |
| Tax/Municipal Search | $100.00 |
| Uncollected Late charges | $163.38 |
| Escrow Advances | $59,968.14 |
| Attorney fees | $2,639.68 |
| Service of Complaint | $90.00 |
| TOTAL INDEBTEDNESS | $358,201.97 |

****The above calculations are as of the filing date. Upon request, a current payoff statement will be provided.



## ORDER INFORMATION

| Order Number | Loan Number | Order Date | Inspection Date | Completion Date | Client Name | Client Contact | VMA Request ID |
|---|---|---|---|---|---|---|---|
| 3851318 | ███████ | Mar 23 2016 | Mar 24 2016 | Mar 25 2016 | Selene Finance LP | Jacoby St. Pierre | 166416 |
| Service Provider Name | | Company Name | | Agent Number | Inspection Type | Deal Name | BPO Vendor |
| Brian Jeffries | | SkyBridge Realty | | (908) 420-6543 | Drive By | | EML |

## SUBJECT PROPERTY INFORMATION

| Property Address | | | Property Type | Borrower Name | Occupancy | County | Census Tract |
|---|---|---|---|---|---|---|---|
| 688 SHERIDAN AVE, PLAINFIELD, NJ 07060 | | | SF Detach | UNK LADSON | Yes | Union | 01 |
| Last Sold Date | Last Sale Price | DOM | Est. Monthly Rent | HOA Fees | Data Source | APN | Zoning |
| | | | $2,200 | | County Tax | 2912-00530-0000-0000 | Residential |
| Currently Listed | Current DOM | Initial List Price | Initial List Date | Current List Price | Last Reduction Date | Agent Name | County Tax |
| No | | | | | | | 2046115 |

Subject Property Comments/External Influences:
Maintained 2 story property where properties range in living space, lot size, and age.

Annual Property Taxes $9,679

## NEIGHBORHOOD INFORMATION

| Location Type | Housing Supply | | Market Trend | Economic Trend | Crime/Vandalism | | Neighborhood Trend |
|---|---|---|---|---|---|---|---|
| Suburban | Stable | | Depreciating | Declining | High Risk | | Declining |
| Price Range | | Median Price | Avg DOM | Avg Marketing Time | | Avg Age of Homes | REO Driven |
| 150000 to 300000 | | $200,000 | 120 | 3 to 6 Mos. | | 90 | No |

Neighborhood Comments
Declining market area. No environmental problems observed or known. Predominantly owner occupied area with some rentals. Area is not REO driven.

## COMPARABLE INFORMATION

| | | Subject | Sold Comp 1 | Sold Comp 2 | Sold Comp 3 | List Comp 1 | List Comp 2 | List Comp 3 |
|---|---|---|---|---|---|---|---|---|
| As-Is Value Sales Price List Price | | $250,000 | $225,000 | $248,000 | $269,000 | $266,999 | $284,900 | $225,000 |
| Price Deviation with As-Is value | | | ($25,000) | ($2,000) | $19,000 | $16,999 | $34,900 | ($25,000) |
| Property Info | | Subject | Sold Comp 1 | Sold Comp 2 | Sold Comp 3 | List Comp 1 | List Comp 2 | List Comp 3 |
| Address | | 688 SHERIDAN AVE PLAINFIELD | 625 Darrow Ave Plainfield | 1144 Thornton Ave Plainfield | 212 Pemberton Ave Plainfield | 1209 Stillman Ave Plainfield | 720 Stelle Ave Plainfield | 430 Darrow Ave Plainfield |
| Zip | | 07060 | 07060 | 07060 | 07060 | 07060 | 07060 | 07060 |
| Data Source | | County Tax | MLS | MLS | MLS | MLS | MLS | MLS |
| Proximity | | | 0.33 Miles | 0.95 Miles | 0.57 Miles | 3 Blocks | 3 Blocks | 0.46 Miles |
| Sale Date | | | Sep 30 2015 | Sep 28 2015 | Feb 15 2016 | | | |
| Sales/List Price | | | $225,000 | $248,000 | $269,000 | $266,999 | $284,900 | $225,000 |
| Initial List Date | | | Mar 14 2015 | Apr 29 2013 | Nov 20 2015 | Sep 28 2015 | Jan 6 2016 | Nov 11 2015 |
| Orig List Price | | | $247,000 | $269,000 | $279,900 | $269,000 | $284,900 | $275,000 |
| Last Reduction Date | | | Sep 18 2015 | Jul 1 2015 | Jan 22 2016 | Mar 25 2016 | Mar 25 2016 | Mar 25 2016 |
| Curr/Final List Price | | | $239,900 | $269,000 | $279,900 | $266,999 | $284,900 | $225,000 |
| DOM | | | 188 | 793 | 63 | 179 | 79 | 135 |
| Lot Size | | 0.22ac | 0.15ac | 0.33ac | 0.21ac | 0.17ac | 0.18ac | 0.20ac |
| View | | Typical | Typical | Typical | Typical | Typical | Typical | Typical |
| Design/Style | | Colonial | Colonial | Colonial | Colonial | Colonial | Colonial | Colonial |
| Type/# Units | | SF Detach 1 | SF Detach 1 | SF Detach 1 | SF Detach 1 | SF Detach 1 | SF Detach 1 | SF Detach 1 |
| Age | | 75yrs | 86yrs | 81yrs | 71yrs | 81yrs | 70yrs | 85yrs |
| Condition | | Average | Average | Average | Average | Average | Average | Average |
| Above Grade Sq Ft | | 1,822 | 1,676 | 1,990 | 1,796 | 1,795 | 1,872 | 2,022 |
| # Rooms/Bd/Bath | | 10 4 1.5 | 7 3 2.5 | 10 4 1.5 | 9 3 2.5 | 8 3 1.5 | 7 3 2.5 | 10 4 3 |
| Basement Sq Ft | | 900 | 800 | 1000 | 900 | 900 | 800 | 1000 |
| % Finished | | 50% | 0% | 50% | 100% | 100% | 100% | 100% |
| Garage Type | | Detached | Detached | None | Detached | Detached | Attached | Detached |
| # Garage Stalls | | 2 | 2 | NA | 2 | 2 | 1 | 2 |
| Fireplace(s) | | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Porch/Patio/Deck | | Yes No Yes | No No No | No Yes Yes | No Yes Yes | Yes Yes No | No No No | No No No |
| Pool/Spa | | No No | No No | No No | No No | No No | No No | No No |
| Other Features | | None | Full Basement | Full Basement | Full Basement | Full Basement | Full Basement | Full Basement |
| Subdivision | | Cedarbrook | None | None | Cedarbrook | None | None | None |
| School District | | Plainfield | Plainfield | Plainfield | Plainfield | Plainfield | Plainfield | Plainfield |
| Sales Type | | | Fair Market | Fair Market | Fair Market | Fair Market | Fair Market | Fair Market |
| Finance Incentives | | | 0 | 0 | 0 | 0 | 0 | 0 |
| HOA Fees | | | 0/mo | 0/mo | 0/mo | 0/mo | 0/mo | 0/mo |

## COMPARABLE PROPERTY COMMENTS

| Sold Comp 1 | | Slightly less living space with full unfinished basement and detached 2 car garage. |
|---|---|---|
| Sold Comp 2 | Best Comp | Slightly more living space with partially finished basement and no garage. |
| Sold Comp 3 | | Similar living space with full finished basement and detached 2 car garage. |
| List Comp 1 | Best Comp | Similar living space with full finished basement and detached 2 car garage. |
| List Comp 2 | | Similar living space with attached 1 car garage and full finished basement. |
| List Comp 3 | | Slightly more living space with detached 2 car garage and full finished basement. |

## MARKETING STRATEGY

| | "As-Is" | "Repaired" | 30 Day Quick Sale | Estimated Marketing Time for Subject: |
|---|---|---|---|---|
| | | | | 90-120 days |
| Probable Sale Price | $250,000 | $250,000 | $235,000 | Conclusion Summary: |
| Suggested List Price | $265,000 | $265,000 | | No repairs needed. Came to values from comps. |



| | EXTERIOR | COMMENTS | | | | | |
|---|---|---|---|---|---|---|---|
| REPAIR DETAILS | Roof | | | | | | $0 |
| | Siding/Trim | | | | | | $0 |
| | Structural | | | | | | $0 |
| | Windows/Doors | | | | | | $0 |
| | Paint | | | | | | $0 |
| | Foundation | | | | | | $0 |
| | Garage | | | | | | $0 |
| | Landscaping | | | | | | $0 |
| | Fence | | | | | | $0 |
| | Other | | | | | | $0 |
| | | | | | Estimated Exterior Repairs | | $0 |
| | INTERIOR | COMMENTS | | | | | |
| | Painting | | | | | | $0 |
| | Walls/Ceiling | | | | | | $0 |
| | Carpets/Floors | | | | | | $0 |
| | Cabinets/Countertops | | | | | | $0 |
| | Plumbing | | | | | | $0 |
| | Electrical | | | | | | $0 |
| | Heating/AC | | | | | | $0 |
| | Appliances | | | | | | $0 |
| | Door/Trim | | | | | | $0 |
| | Cleaning | | | | | | $0 |
| | Other | | | | | | $0 |
| | | | | | Estimated Interior Repairs | | $0 |
| | | | | | Estimated Total Repairs | | $0 |

| | Date Listed | Date Sold | List Price | Sale Price | Data Source | Comments |
|---|---|---|---|---|---|---|
| PRIOR SALES & LISTING HISTORY | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | |
|---|---|
| COMMENTS | **Service Provider Comments:** <br> Declining market area. Subject is a single family detached 2 story property with 4 bedrooms, 1 full bathroom, and 1 half bath. Partially finished basement with detached 2 car garage. Property maintained with no hazards or damages observed. Properties in the area range in living space, lot size, and age. Located near major highways. Used most similar properties in the area for comps.I attest that I have researched the subject's sales history and found no sales within the past 3 years. |
| | **Vendor Comments:** <br> . |
| | **Quality Control Comments:** <br> The proximity for Comparable Sale #2: Expanded search to find most similar properties to the subject. The proximity for Comparable Sale #3: Expanded search to find most similar properties to the subject. Sold Comp# 2 is most similar to the subject: Most comparable with more living space and no garage. Active Comp# 1 is most similar to the subject: Most similar living space, lot size, and age. |

| | |
|---|---|
| /s/ Brian Jeffries (0901854) - SkyBridge Realty | Mar 29 2016 2:07PM |
| Service Provider Signature (License Number) - Company Name | Date |

Broker agreed to digital signature upon submission.





| | Address | City | BR | BA | LotSize | SaleDate | Yr Blt | Sale/List Price | Dist |
|---|---|---|---|---|---|---|---|---|---|
| ★ | 688 SHERIDAN AVE | PLAINFIELD | 4 | 1.5 | 0.22ac | | 1941 | | |
| L1 | 1209 Stillman Ave | Plainfield | 3 | 1.5 | 0.17ac | | 1935 | $266,999 | 3 Blocks |
| L2 | 720 Stelle Ave | Plainfield | 3 | 2.5 | 0.18ac | | 1946 | $284,900 | 3 Blocks |
| L3 | 430 Darrow Ave | Plainfield | 4 | 3.0 | 0.20ac | | 1931 | $225,000 | 0.46 Miles |
| S1 | 625 Darrow Ave | Plainfield | 3 | 2.5 | 0.15ac | Sep 30 2015 | 1930 | $225,000 | 0.33 Miles |
| S2 | 1144 Thornton Ave | Plainfield | 4 | 1.5 | 0.33ac | Sep 28 2015 | 1935 | $248,000 | 0.95 Miles |
| S3 | 212 Pemberton Ave | Plainfield | 3 | 2.5 | 0.21ac | Feb 15 2016 | 1945 | $269,000 | 0.57 Miles |



SUBJECT PROPERTY

MapTuit Map



Photo (Front)



Photo (Front)





SUBJECT PROPERTY

Photo (Front)



Photo (Addr Verification)



Photo (Addr Verification)





SUBJECT PROPERTY

Photo (Side)



03 . 24 . 2016

Photo (Side)



03 . 24 . 2016

Photo (Rear)



03 . 24 . 2016



SUBJECT PROPERTY

Photo (Rear)



Photo (Street)



Photo (Street)





SUBJECT PROPERTY

Photo (Street)



03 . 24 . 2016

Photo (View across street)



03 . 24 . 2016



# Sold Comparables

## SOLD 1



| Address | 625 Darrow Ave | | | Zip | 07060 | Sales Price | $225,000 |
|---|---|---|---|---|---|---|---|
| Bed | 3 | Bath | 2.5 | Rooms | 7 | Sale Date | Sep 30 2015 |
| Sq Ft | 1676 | Lot Size | 0.15ac | Yr Built | 1930 | Final List Price | $225,000 |
| Proximity | 0.33 Miles | DOM | 188 | View | Typical | Last Reduction Date | Sep 18 2015 |
| Basement | Y | Bsmt SQFT | 800 | % Finish | 0% | Original List Price | $247,000 |
| Condition | Average | Style | Colonial | Units | 1 | Initial List Date | Mar 14 2015 |
| Pool/Spa | N / N | Patio/Deck | N / N | Fireplace | Y | Garage Type | Detached |

Property/MLS Comments:

Slightly less living space with full unfinished basement and detached 2 car garage.

## SOLD 2



| Address | 1144 Thornton Ave | | | Zip | 07060 | Sales Price | $248,000 |
|---|---|---|---|---|---|---|---|
| Bed | 4 | Bath | 1.5 | Rooms | 10 | Sale Date | Sep 28 2015 |
| Sq Ft | 1990 | Lot Size | 0.33ac | Yr Built | 1935 | Final List Price | $248,000 |
| Proximity | 0.95 Miles | DOM | 793 | View | Typical | Last Reduction Date | Jul 1 2015 |
| Basement | Y | Bsmt SQFT | 1000 | % Finish | 50% | Original List Price | $269,000 |
| Condition | Average | Style | Colonial | Units | 1 | Initial List Date | Apr 29 2013 |
| Pool/Spa | N / N | Patio/Deck | Y / Y | Fireplace | Y | Garage Type | None |

Property/MLS Comments:

Slightly more living space with partially finished basement and no garage.

## SOLD 3

| Address | 212 Pemberton Ave | | | Zip | 07060 | Sales Price | $269,000 |
|---|---|---|---|---|---|---|---|
| Bed | 3 | Bath | 2.5 | Rooms | 7 | Sale Date | Feb 15 2016 |
| Sq Ft | 1796 | Lot Size | 0.21ac | Yr Built | 1945 | Final List Price | $225,000 |
| Proximity | 0.57 Miles | DOM | 63 | View | Typical | Last Reduction Date | Jan 22 2016 |
| Basement | Y | Bsmt SQFT | 900 | % Finish | 100% | Original List Price | $279,900 |
| Condition | Average | Style | Colonial | Units | 1 | Initial List Date | Nov 20 2015 |
| Pool/Spa | N / N | Patio/Deck | Y / N | Fireplace | Y | Garage Type | Detached |

Property/MLS Comments:

Similar living space with full finished basement and detached 2 car garage.



# Listing Comparables

## LIST 1



| Address | 1209 Stillman Ave | | | Zip | 07060 | Current List Price | $266,999 |
|---------|-------------------|---|---|-----|-------|--------------------|----------|
| Bed | 3 | Bath | 1.5 | Rooms | 8 | Last Reduction Date | Mar 25 2016 |
| Sq Ft | 1795 | Lot Size | 0.17ac | Yr Built | 1935 | Original List Price | $269,000 |
| Proximity | 3 Blocks | DOM | 179 | View | Typical | Initial List Date | Sep 28 2015 |
| Basement | Y | Bsmt SQFT | 900 | % Finish | 100% | Garage Type | Detached |
| Condition | Average | Style | Colonial | Units | 1 | | |
| Pool/Spa | N / N | Patio/Deck | Y / N | Fireplace | Y | | |

Property/MLS Comments:
Similar living space with full finished basement and detached 2 car garage.

## LIST 2

| Address | 720 Stelle Ave | | | Zip | 07060 | Current List Price | $284,900 |
|---------|----------------|---|---|-----|-------|--------------------|----------|
| Bed | 3 | Bath | 2.5 | Rooms | 7 | Last Reduction Date | Mar 25 2016 |
| Sq Ft | 1872 | Lot Size | 0.18ac | Yr Built | 1935 | Original List Price | $284,900 |
| Proximity | 3 Blocks | DOM | 79 | View | Typical | Initial List Date | Jan 6 2016 |
| Basement | Y | Bsmt SQFT | 800 | % Finish | 100% | Garage Type | Attached |
| Condition | Average | Style | Colonial | Units | 1 | | |
| Pool/Spa | N / N | Patio/Deck | N / N | Fireplace | Y | | |

Property/MLS Comments:
Similar living space with attached 1 car garage and full finished basement.

## LIST 3



| Address | 430 Darrow Ave | | | Zip | 07060 | Current List Price | $225,000 |
|---------|----------------|---|---|-----|-------|--------------------|----------|
| Bed | 4 | Bath | 3 | Rooms | 10 | Last Reduction Date | Mar 25 2016 |
| Sq Ft | 2022 | Lot Size | 0.20ac | Yr Built | 1945 | Original List Price | $275,000 |
| Proximity | 0.46 Miles | DOM | 135 | View | Typical | Initial List Date | Nov 11 2015 |
| Basement | Y | Bsmt SQFT | 1000 | % Finish | 100% | Garage Type | Detached |
| Condition | Average | Style | Colonial | Units | 1 | | |
| Pool/Spa | N / N | Patio/Deck | N / N | Fireplace | N | | |

Property/MLS Comments:
Slightly more living space with detached 2 car garage and full finished basement.

Neither eMortgage Logic nor any of its affiliates, members, managers or contractors makes any representation or warranty as to the accuracy or completeness of the information contained in this broker price opinion. You should use good faith efforts in determining that the content of all information to be provided to or obtained by you is accurate. This analysis has been performed by a licensed real estate professional and is intended for the benefit of the addressee only. The Brokers Price Opinion is not to be construed as an appraisal and may not be used as such for any purpose. The purpose of this BPO is to provide an estimate of the probable sales price of the property, utilizing the sales comparison approach methodology and will not be used for loan origination. This opinion may not be used by any party as the primary basis to determine the value of a parcel of real property for a mortgage loan origination, including first and second mortgages, refinances or equity lines of credit. Notwithstanding any preprinted language to the contrary, this opinion is not an appraisal of the market value of the property. If an appraisal is desired, the services of a licensed appraiser must be obtained.

**Union Plainfield City (2912)**                          **688 Sheridan**                          **List Price: $309,900**

**Residential Agent Complete Report**



| | | | | | |
|---|---|---|---|---|---|
| MLS#: | **2046115** | Section: | **Cedarbrook** | LP: | **$309,900** |
| Status: | **SD** | ZN: | **Residential** | OLP: | **$309,900** |
| Rms: | **10** | GRS: | **Cedarbrrok** | SP: | **$314,000** |
| Bdrm: | **4** | MSJR: | **Hubbard** | LD: | **01/05/2005** |
| FB: | **1** | HS: | **Plainfield** | XD: | **04/05/2005** |
| HB: | **1** | Acres: | | UCD: | **02/18/2005** |
| ZIP: | **08820** | LtSz: | **64.98x149 IRR** | AntCd: | **04/05/2005** |
| RZIP: | | SqFt: | | CD: | **03/23/2005** |
| Block: | **00530** | CLR: | **white** | ADM: | **44** |
| Lot: | **00001** | CL: | **No** | DOM: | **44** |
| Unit #: | | GSMLS.com: | **Yes** | Terms: | **Conventional** |
| Floor #: | | Pets: | | SDA: | **Yes** |
| Bldg #: | **688** | YB/Desc/Ren: | **9999 / Unknown /** | | |
| FHA55+: | | PSubType: | | | |
| Style: | **Colonial** | | | | |

Directions: **grant to sheridan,plainfield av to sheridan,randolph rd becomes sheridan once u cross plainfield av**
Remarks: **Location! Upscale Neighborhood,spacious rms, newer roof, siding,H/W heater,updated main bath,walk up attic waiting to be finished into Loft,Lrg basement,FP in L/R,2nd Fl deck overlooking huge**
Agent Remarks: **yard'HOME WARRANTY' Seller Motivated Quick Closing!! appt made 2 hrs prior show daily 2pm-7pm**

## INTERIOR

| | | | |
|---|---|---|---|
| Applncs: | **Microwave Oven, Range/Oven-Gas, Washer** | IntFeat: | **Smoke Detector** |
| Bsmnt: | **Yes / Finished-Partially, Full** | Kitch: | **Breakfast Bar, Second Kitchen** |
| Dine: | **Formal Dining Room** | MstBath: | **Stall Shower And Tub** |
| Exclu: | **collectible oven in basement,new black kitchen appl, washer & dryer** | | |
| FirePl: | **1 / Living Room, Wood Burning** | | |
| Floor: | **Ceramic Tile, Parquet-Some, Tile, Wood** | | |

## EXTERIOR / OTHER FEATURES

| | | | |
|---|---|---|---|
| Exterior: | **Vinyl Siding** | Garage: | **2 / DetachedDetached** |
| ExtFeat: | **Deck** | LotDesc: | **Corner** |
| | | Roof: | **Asphalt Shingle** |

## ROOMS

| | | | |
|---|---|---|---|
| LivRm: **22x14 / First** | DinRm: **14x14 / First** | Kitch: **11x10 / First** | Den: **13x10 / First**   FamRm: **16x12 / First** |
| Mstr: **19x17 / Second** | Bed2: **14x12 / Second** | Bed3: **12x11 / Second** | Bed4: **12x10 / Second** |
| Breakfast : **10x11/First** | Loft : **/Third** | Laundry Room: **/Basement** | Workshop: **/Basement** |

Level1: **Bath(s) Other, Breakfast Room, Den, Dining Room, Kitchen, Living Room, Entrance Vestibule**
Level2: **4 Or More Bedrooms, Bath Main**
Level3: **Attic**                                                          OthLev: **Loft**

## UTILITIES

| | | | |
|---|---|---|---|
| Heat: | **1 Unit** | Sewer: | **Public Sewer** |
| Cool: | **Window A/C(s)** | Utilities: | **Electric, Gas-Natural** |
| Fuel: | **Oil** | Water: | **Public Water** |
| Service: | **Cable TV Available, Garbage Extra Charge** | WtrHt: | **Gas** |

## FINANCIAL INFORMATION / TAX INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Fee: | **$ /** | HmWrnty: | **Yes** | Taxes: **$5,309 / 2003** | LndAsmt: **$49,100** |
| AppFee: | **$** | LenderAprvReq: | OTP: **Fee Simple** | TaxRt: **4.450 / 2003** | BldAsmt: **$78,400** |
| Other: | **$ /** | Easement: **No /** | | | TotAsmt: **$127,500** |

## SHOWING INFORMATION

| | | | |
|---|---|---|---|
| Owner: | **James & Maryann Nettles** | Sign: | **Yes** |
| Instr: | **show 2pm-7pm call 2 hrs prior f** | Posses: | **closing** |
| Show: | **Call Listing Office** | | |

## LISTING OFFICE INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| ListOff: | **KELLER WILLIAMS ELITE REALTORS** | (2765) | Ph:**732-549-1998** | Fax: **732-548-3478** | |
| ListAgt1: | **WEANONA HUGIE** | (247194) | Ph:**732 261 0314** | Fax: **1 866 716 5779** | |
| BREL: | **Seller Agent** | | BB:**2.5 - $50** | SA: **2.5 - $50** | TB:**2.5 - $50** |
| LType: | **Exclusive Right to Sell** | | VarComm: | | |

## SELLING OFFICE INFORMATION

| | | | | |
|---|---|---|---|---|
| SellOff: | **ERA REED REALTY, INC** | (0034) | Ph:**908-769-0011** | Fax: **908-753-7877** |
| SellAgt1: | **YAZMIN CASTRO** | (260651) | Ph:**732-718-9981** | Fax: |

Copyright, Garden State MLS, L.L.C.                    **Info. deemed RELIABLE but not GUARANTEED - ALL Room Sizes are Approx.**                    NICK MANIS

MERS MIN: 100039046743558005

Ladson, Caprice

# ADJUSTABLE RATE NOTE

**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*)-Rate Caps Accrued Interest Only for Fixed Rate Period)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| March 23, 2005 | Plainfield | NJ |
|---|---|---|
| [Date] | [City] | [State] |

688 Sheridan Avenue
Plainfield, NJ 07060
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.$ 251,200.00     (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Quicken Loans Inc.                             ,
a          Michigan          corporation. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest for the first 120    months at a yearly rate of     5.750 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay a monthly payment of accrued interest only for the first 120    months of this loan by making a payment each month. Beginning with the    121    month, I will pay principal and interest by making a payment every month thereafter.

I will make my monthly payments on the    1st   day of each month beginning on May 1, 2005                                                                .

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on     April 1, 2035     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 530483, Livonia, MI 48153-0483                           ,
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S.$1,203.67          . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the    1st   day of April          2008      , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."


q46743558000140

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Quarter percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    8.750 % or less than    2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One and No-Thousandths    percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding    Six   months. My interest rate will never be greater than 10.750   %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWERS FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of interest during the first 120 months and of the principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3 (A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_Caprice C Ladson_    03/23/2005
Caprice Ladson             Borrower                                       Borrower

            Borrower                                       Borrower

            Borrower                                       Borrower

            Borrower                                       Borrower

MERS MIN: 100039046743558005

4674355800
Ladson, Caprice

# ADJUSTABLE RATE NOTE

**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*)-Rate Caps Accrued Interest Only for Fixed Rate Period)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| March 23, 2005 | Plainfield | NJ |
|---|---|---|
| [Date] | [City] | [State] |

688 Sheridan Avenue
Plainfield, NJ 07060
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.$ 251,200.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Quicken Loans Inc. , a Michigan corporation. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest for the first 120 months at a yearly rate of 5.750 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay a monthly payment of accrued interest only for the first 120 months of this loan by making a payment each month. Beginning with the 121 month, I will pay principal and interest by making a payment every month thereafter.

I will make my monthly payments on the 1st day of each month beginning on May 1, 2005

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 530483, Livonia, MI 48153-0483 or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S.$1,203.67 . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the 1st day of April 2008 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

q48743558000140

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Quarter percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.750 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One and No-Thousandths percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding Six months. My interest rate will never be greater than 10.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.



## 7. BORROWERS FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of interest during the first 120 months and of the principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3 (A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

> Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_Caprice Ladson_                  03/23/2005
Caprice Ladson                          Borrower

_____  Borrower

_____  Borrower

_____  Borrower

_____  Borrower

WITHOUT RECOURSE
Pay to the Order of

QUICKEN LOANS INC.        Borrower

BY

SCOTT JOHNSON
CAPTURE MANAGER

_____  Borrower

Ladson, Caprice

# ADJUSTABLE RATE NOTE

**(LIBOR Six-Month Index (As Published In** *The Wall Street Journal*)**-Rate Caps Accrued Interest Only for Fixed Rate Period)**

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

March 23, 2005        Plainfield        NJ
[Date]                  [City]            [State]

688 Sheridan Avenue
Plainfield, NJ 07060
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.$ 251,200.00      (this amount is called "Principal"), plus interest, to the order of Lender. Lender is Quicken Loans Inc.          ,
a      Michigan        corporation. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest for the first 120   months at a yearly rate of 5.750 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay a monthly payment of accrued interest only for the first 120   months of this loan by making a payment each month. Beginning with the 121   month, I will pay principal and interest by making a payment every month thereafter.

I will make my monthly payments on the 1st day of each month beginning on May 1, 2005            .

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1, 2035    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 530483, Livonia, MI 48153-0483        ,
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S.$1,203.67      . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the 1st day of April      2008    , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."



q46743558000140

**...e Index**

...nning with the first Change Date, my interest rate will be based on an Index. The "Index" is the interbank offered rates for six month U.S. dollar-denominated deposits in the London market /, as published in The Wall Street Journal. The most recent Index figure available as of the first business ...he month immediately preceding the month in which the Change Date occurs is called the "Current

If the Index is no longer available, the Note Holder will choose a new index that is based upon .parable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Quarter percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.750 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One and No-Thousandths percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding Six months. My interest rate will never be greater than 10.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWERS FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of interest during the first 120 months and of the principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3 (A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_Caprice Ladson_ _____ 03/23/2005
Caprice Ladson                   Borrower

_____
                                 Borrower

_____
                                 Borrower

_____
                                 Borrower

_____
                                 Borrower

WITHOUT RECOURSE
Pay to the Order of
QUICKEN LOANS INC.               Borrower
BY
SCOTT JOHNSON
CAPTURE MANAGER

_____
                                 Borrower

_____
                                 Borrower

_____
                                 Borrower

2003/06  iomuln4.pcl                Page 4 of 4

Return To:
Sharyn Labby
Quicken Loans Inc.
20555 Victor Parkway
Livonia, MI 48152

CERTIFIED TRUE COPY

*Danelle Fuller*

Prepared By:
Bryan Owens

―――――――――――[Space Above This Line For Recording Data]―――――――――――

# MORTGAGE

MIN 100039046743558005

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated          March 23, 2005          ,
together with all Riders to this document.
**(B) "Borrower"** is Caprice Ladson, a married woman *and Chibueze C. Obi, her husband*

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**NEW JERSEY** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3031 1/01
555312444
-6A(NJ) (0005)
Page 1 of 15          Initials:
VMP MORTGAGE FORMS - (800)521-7291



q46743558000233

**(D) "Lender"** is Quicken Loans Inc.

Lender is a Corporation
organized and existing under the laws of       the State of Michigan
Lender's address is 20555 Victor Parkway, Livonia, MI 48152

**(E) "Note"** means the promissory note signed by Borrower and dated      March 23, 2005
The Note states that Borrower owes Lender Two Hundred Fifty One Thousand Two
Hundred and 00/100                                    **Dollars**
(U.S. $251,200.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than      April 1, 2035
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the
County of Union :
[Type of Recording Jurisdiction]             [Name of Recording Jurisdiction]


SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

Tax Parcel Num:00530.    00001.


Property Account Number:                         which currently has the address of
688 Sheridan Avenue                                                        [Street]
            Plainfield          [City], New Jersey 07060       [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

-6A(NJ) (0005)                    Page 3 of 15          Initials:            Form 3031 1/01

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials:

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.



BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_Danielle Fallon_

DANIELLE FALLON
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR. 5, 2008

_Danielle Fallon_

DANIELLE FALLON
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR 5 2008

_Caprice Ladson_ 03/23/2005 ___ (Seal)
Caprice Ladson                              -Borrower

_Chibueze C. Obi_ _____ (Seal)
Chibueze C. Obi                             -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

**STATE OF NEW JERSEY,**           Union                    **County ss:**

On this    23rd    day of    March, 2005    , before me, the subscriber,
personally appeared Caprice Ladson, a married woman

*and Chibueze C. Obi*

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

_____

Notary Public

DANIELLE FALLON
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR. 5, 2008

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps
Accrued Interest Only for Fixed Rate Period)**

THIS ADJUSTABLE RATE RIDER is made this 23rd day of March, 2005 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to
secure Borrower's Adjustable Rate Note (the "Note") to Quicken Loans Inc. ,
a Michigan corporation ("Lender") of the same date and covering the property described in the Security
Instrument and located at:

688 Sheridan Avenue
Plainfield, NJ 07060
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT
BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 5.750 %. The Note provides for
changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of April 2008 , and
on that day every 6th month thereafter. Each date on which my interest rate could change is called a
"Change Date."

q46743558000470

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Quarter                                    percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 8.750    % or less than          2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One and No-Thousandths percentage points (        1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 10.750    %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Caprice Chacls_ ___03/23/2005___                    _____
Caprice Ladson                    Borrower                                    Borrower

_____
Chibueze C. Obi                    Borrower                                    Borrower


_____
                                   Borrower                                    Borrower


_____
                                   Borrower                                    Borrower

Return To:
Sharyn Labby
Quicken Loans Inc.
20555 Victor Parkway
Livonia, MI  48152

CERTIFIED TRUE COPY



Prepared By:
Bryan Owens

————————————————[Space Above This Line For Recording Data]————————————————

# MORTGAGE

MIN 100039046743558005

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  March 23, 2005  ,
together with all Riders to this document.
**(B) "Borrower"** is Caprice Ladson, a married woman and Chibueze C. Obi, her husband

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI  48501-2026, tel. (888) 679-MERS.

NEW JERSEY - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3031 1/01
555312444
⓿Ⓓ -6A(NJ) (0005)
Page 1 of 15          Initials
VMP MORTGAGE FORMS - (800)521-7291

q46743558000233

**(D) "Lender"** is Quicken Loans Inc.

Lender is a Corporation
organized and existing under the laws of       the State of Michigan
Lender's address is 20555 Victor Parkway, Livonia, MI  48152

**(E) "Note"** means the promissory note signed by Borrower and dated       March 23, 2005
The Note states that Borrower owes Lender Two Hundred Fifty One Thousand Two
Hundred and 00/100                                                          **Dollars**
(U.S. $251,200.00       ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than       April 1, 2035
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

County of Union :
[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

Tax Parcel Num:00530.    00001.

Property Account Number: which currently has the address of
688 Sheridan Avenue [Street]
        Plainfield [City], New Jersey 07060 [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

-6A(NJ) (0005)        Page 3 of 15        Initials: C.CO        Form 3031 1/01

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires), provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

DANIELLE FALLON
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR 5, 2008



DANIELLE FALLON
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR 5 2008

_____ 03/23/2005 __ (Seal)
Caprice Ladson                          -Borrower

_____ (Seal)
Chibueze C. Obi                         -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                -Borrower

**STATE OF NEW JERSEY,**          Union          County ss:

On this      23rd      day of      March, 2005      , before me, the subscriber,
personally appeared Caprice Ladson, a married woman

*and Chibueze C. Obi*

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

*Danielle Fallon*

Notary Public

DANIELLE FALLON
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR. 5, 2008

-6A(NJ) (0006)          Page 15 of 15          Initials: C-L-O          Form 3031 1/01

# SCHEDULE A
# DESCRIPTION

**Application No.:** PTC-034003

ALL that certain lot, parcel or tract of land, situate and lying in the City of Plainfield, County of Union and State of New Jersey being more particularly described as follows:

BEGINNING at an iron pipe found at the point of intersection of the Northwesterly sideline of Sheridan Avenue with the Southwesterly sideline of Spooner Avenue; from thence running

(1)     Along the Southwesterly sideline of Spooner Avenue, North 34 degrees 37 minutes 00 seconds West, 149.99 feet to a point; thence

(2)     South 53 degrees 29 minutes 00 seconds West, 64.84 feet to a point; thence

(3)     South 34 degrees 33 minutes 00 seconds East, 147.75 feet to a point in the Northwesterly sideline of Sheridan Avenue; thence

(4)     Along the same, North 55 degrees 27 minutes 00 seconds East, 64.98 feet to the point and place of BEGINNING.


FOR INFORMATIONAL PURPOSES ONLY:
Being commonly known as Lot 1, Block 530 on the Tax Map of the City of Plainfield.


The above description is drawn in accordance with a survey made by Behar Surveying Associates, P.C., dated February 10, 2005.


*THIS IS A REVISED DESCRIPTION DATED February 14, 2005. THIS DESCRIPTION MUST BE USED IN THE PREPARATION OF ALL DOCUMENTS.*



# SCHEDULE A
# DESCRIPTION

**Application No.:** PTC-034003

ALL that certain lot, parcel or tract of land, situate and lying in the City of Plainfield, County of Union and State of New Jersey being more particularly described as follows:

BEGINNING at a point of intersection formed by the Northwesterly line of Sheridan Avenue and the Southwesterly line of Spooner Avenue; from thence running

(1)   Along the Southwesterly line of Spooner Avenue, North 34 degrees 37 minutes West, 149.99 feet; thence

(2)   South 53 degrees 29 minutes West, 64.84 feet; thence

(3)   South 34 degrees 33 minutes East, 147.75 feet to the Northwesterly sideline of Sheridan Avenue; thence

(4)   Along the same, North 55 degrees 27 minutes East, 64.98 feet to the point and place of BEGINNING.

FOR INFORMATIONAL PURPOSES ONLY:
Being commonly known as Lot 1, Block 530 on the Tax Map of the City of Plainfield.

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps**

**Accrued Interest Only for Fixed Rate Period)**

THIS ADJUSTABLE RATE RIDER is made this  23rd  day of        March, 2005        ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to
secure Borrower's Adjustable Rate Note (the "Note") to  Quicken Loans Inc.                    ,
a Michigan corporation ("Lender") of the same date and covering the property described in the Security
Instrument and located at:

688 Sheridan Avenue
Plainfield, NJ 07060
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT
BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of        5.750 %. The Note provides for
changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of April          2008    , and
on that day every 6th month thereafter. Each date on which my interest rate could change is called a
"Change Date."

2003/06  iomr1.pcl                Page 1 of 4
555312496        200306.00                              q46743558000470

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Quarter                                                    percentage points (   2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    8.750    % or less than           2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One and No-Thousandths percentage points (        1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 10.750      %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Caprice Chads_ 03/23/2005
Caprice Ladson                     Borrower                                          Borrower

_Chibueze C. Obi_                  Borrower                                          Borrower

_____  Borrower          _____  Borrower

_____  Borrower          _____  Borrower

2003/06  iomr4.pcl                      Page 4 of 4

34003

Return To:
Sharyn Labby
Quicken Loans Inc.
20555 Victor Parkway
Livonia. MI  48152



Received & Recorded   Mortgage-2
Union County, NJ       Inst#   353102
4/19/2005  9:55                          Pgs-20
Joanne Rajoppi         Consider.    .00
County Clerk           RT Fee       .00
Operator
GAIL

## RECORD & RETURN

Prepared By:
Bryan Graham Premier Abstract & Title Agency, Inc.
1006 Eastpark Boulevard
Cranbury, New Jersey 08512

————[Space Above This Line For Recording Data]————

# MORTGAGE

MIN 100039046743558005

*Dan Hoffman (?) citi Mort.*

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated March 23, 2005 , together with all Riders to this document.
**(B) "Borrower"** is Caprice Ladson. a married woman *and Chibueze C. Obi, her husband*

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**NEW JERSEY** - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3031 1/01
555312444
VMP ®-6A(NJ) (0005)
Page 1 of 15                    Initials: C.O
     VMP MORTGAGE FORMS - (800)521-7291

q46743558000233

MI1122-0501

**(D) "Lender"** is Quicken Loans Inc.

Lender is a Corporation
organized and existing under the laws of the State of Michigan
Lender's address is 20555 Victor Parkway, Livonia, MI 48152

**(E) "Note"** means the promissory note signed by Borrower and dated March 23, 2005
The Note states that Borrower owes Lender Two Hundred Fifty One Thousand Two
Hundred and 00/100 Dollars
(U.S. $251,200.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than April 1, 2035 .

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

MI1122-0503

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the County                          of                                    Union                                    :
[Type of Recording Jurisdiction]         [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

Tax Parcel Num:00530.      00001.

Property Account Number:                                        which currently has the address of
688 Sheridan Avenue                                                                            [Street]
                    Plainfield                     [City], New Jersey 07060         [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**VMP®**-6A(NJ) (0005)                        Page 3 of 15          Initials: C.C.O          Form 3031 1/01

MI1122-0504

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien, in legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: C C-D

Form 3031 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

MI 1122-0509

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

MI122-0510

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the

MI122-0512

new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Section 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

MI I 122-0514

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

**DANIELLE FALLON**
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR. 5, 2008

_____

**DANIELLE FALLON**
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR. 5, 2008

_____ 03/23/2005 ___(Seal)
Caprice Ladson                          -Borrower

_____(Seal)
Chibueze R. Obi                         -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower

_____(Seal)
                                        -Borrower


MI I I22-0515

**STATE OF NEW JERSEY,**      Union      **County ss:**

On this   23rd   day of   March, 2005      , before me, the subscriber,
personally appeared Caprice Ladson, a married woman

*Chibueze C. Obi*

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

_____
Notary Public

**DANIELLE FALLON**
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAR. 5, 2008

| PREMIER ABSTRACT & TITLE AGY. | | Inst.# |
|---|---|---|
| 1006 EASTPARK BOULEVARD | | 3531 02 |
| CRANBURY | NJ 08512 | Paid |
| | Recording Fee | 220.00 |
| Mortgage | RT Fee | .00 |

*VMP*®-6A(NJ) (0005)      Page 15 of 15      Initials:   Form 3031 1/01

*END OF DOCUMENT*

**MI I I 22-0520**

# SCHEDULE A
# DESCRIPTION

**Application No.: PTC-034003**

ALL that certain lot, parcel or tract of land, situate and lying in the City of Plainfield, County of Union and State of New Jersey being more particularly described as follows:

BEGINNING at an iron pipe found at the point of intersection of the Northwesterly sideline of Sheridan Avenue with the Southwesterly sideline of Spooner Avenue; from thence running

(1)     Along the Southwesterly sideline of Spooner Avenue, North 34 degrees 37 minutes 00 seconds West, 149.99 feet to a point; thence

(2)     South 53 degrees 29 minutes 00 seconds West, 64.84 feet to a point; thence

(3)     South 34 degrees 33 minutes 00 seconds East, 147.75 feet to a point in the Northwesterly sideline of Sheridan Avenue; thence

(4)     Along the same, North 55 degrees 27 minutes 00 seconds East, 64.98 feet to the point and place of BEGINNING.


FOR INFORMATIONAL PURPOSES ONLY:
Being commonly known as Lot 1, Block 530 on the Tax Map of the City of Plainfield.


The above description is drawn in accordance with a survey made by Behar Surveying Associates, P.C., dated February 10, 2005.


*THIS IS A REVISED DESCRIPTION DATED February 14, 2005. THIS DESCRIPTION MUST BE USED IN THE PREPARATION OF ALL DOCUMENTS.*

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps**
**Accrued Interest Only for Fixed Rate Period)**

THIS ADJUSTABLE RATE RIDER is made this 23rd day of March, 2005 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to
secure Borrower's Adjustable Rate Note (the "Note") to Quicken Loans Inc. ,
a Michigan corporation ("Lender") of the same date and covering the property described in the Security
Instrument and located at:

688 Sheridan Avenue
Plainfield, NJ 07060
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT
BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of 5.750 %. The Note provides for
changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
**(A) Change Dates**
The interest rate I will pay may change on the first day of April 2008 , and
on that day every 6th month thereafter. Each date on which my interest rate could change is called a
"Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Quarter                                                     percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than 8.750 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One and No-Thousandths percentage points ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 10.750 %.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

2003/06 iomr2.pcl                              Page 2 of 4

MII122-0517

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MI I 122-0518

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_Caprice L Ladson_    03/23/2005
Caprice Ladson      Borrower

_____ Borrower

_Chibueze C. Obi_
Chibueze C. Obi      Borrower

_____ Borrower

_____ Borrower

_____ Borrower

_____ Borrower

_____ Borrower

MI1122-0519



Received & Recorded    Assignments-4
Union County, NJ      Inst# **145292**
10/12/2011 9:41
**Joanne Rajoppi**      Consider.        .00        Pgs-2
**County Clerk**        RT Fee          .00
Operator
ALLISON

*WHEN RECORDED MAIL TO:*
*PHELAN HALLINAN & SCHMIEG, PC*
*400 Fellowship Road*
*Suite 100*
*Mt. Laurel, NJ 08054*

---

## *ASSIGNMENT OF MORTGAGE*

7.21.11

FOR VALUE RECEIVED, **SELENE FINANCE LP.**, the undersigned, as beneficiary or successor thereto, whose address is **c/o SELENE FINANCE, 9990 RICHMOND STREET, SUITE 400 SOUTH, HOUSTON, TX 77042-4546**, hereby grants, conveys, assigns and transfers unto SRMOF 2009-1 TRUST, whose address is **c/o SELENE FINANCE, 9990 RICHMOND STREET, SUITE 400 SOUTH, HOUSTON, TX 77042-4546**, its successors and assigns, all beneficial interest under that certain Mortgage dated 03/23/2005. Said Mortgage is recorded in the State of New Jersey, County of **UNION**.

**Mortgage Recorded: 04/19/2005**
**Original Mortgage Company: Mortgage Electronic Registration Systems, Inc. as a nominee for Quicken Loans, Inc., ITS SUCCESSORS AND ASSIGNS**
**Original Mortgagors: CAPRICE LADSON and CHIBUEZE C. OBI**
**Original Loan Amount: $251,200.00**
**Book: 11122**
**Page: 501**
**Property Address: 684-688 SHERIDAN AVENUE, PLAINFIELD, NJ 07060-2237**

The transfer of the mortgage and accompanying rights was effective at the time the loan was sold and consideration passed to the Assignee. This assignment is solely intended to describe the instrument sold in a manner sufficient to put third parties on public notice of what has been sold.

*TO HAVE AND TO HOLD* the same unto the said Assignee, its successor and assigns, forever, subject only to all the provisions contained in the said Mortgage and the Bond, Note or other Obligation. And the said Assignor hereby constitutes and appoints the Assignee as the Assignor s true and lawful attorney, irrevocable in law or in equity, in

AB1393-0150

the Assignor s name, place and stead but at the Assignee s cost and expense to have, use and take all lawful ways and means for the recovery of all the said money and interest; and in case of payment, to discharge the same as fully as the Assignor might or could do if these presents were not made.

PHS #CMI-6537#2

*I AGREE TO THE TERMS OF THIS ASSIGNMENT.*

*Witnessed or Attested by:*

_____ (Seal)          Title
sign and print name

Carter nicholas

### NOTARY ACKNOWLEDGMENT

**CAPACITY CLAIMED BY SIGNER:** *Vice President*

**OF** SELENE FINANCE LP

**STATE OF** Texas
**COUNTY OF** Harris

On, 7-21-11 , before me, Lauren McRorey, a Notary Public, personally appeared Carter nicholas, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same in his/her authorized capacity and that by his/her signature on the instrument, the entity upon behalf of which the person acted executed the instrument.

*WITNESS my hand and official seal.*

```
LAUREN MCROREY
Notary Public, State of Texas
My Commission Expires
June 08, 2013
```

_____
Notary Public

END OF DOCUMENT

PHELAN HALLINAN & SCHMIEG PC          Inst.#
400 FELLOWSHIP ROAD                    145292
SUITE 100
MT LAUREL            NJ 08054-9873      Paid
                     Recording Fee    50.00
Assignments          RT Fee            .00

AB1393-0151

Inst No. 601520          Book: 1390 Page: 936
Date: 6/27/2011    Time: 1:41:49 PM        Pages: 1
Fee: 40.00            County: Union
Requesting Party: Certified copy
Recorder: ==Certified copy ppi==
and Correct Copy, Esquire: NJ
S/Donna L. Shilton

PREPARED BY & RETURN TO:
M. E. Wileman
Orion Financial Group, Inc.
2860 Exchange Blvd. # 100
Southlake, TX 76092          **Assignment of Mortgage**          Send Any Notices To Assignee.
  For Valuable Consideration, the undersigned, **CITIMORTGAGE, INC. 4050 REGENT BLVD, MAIL STOP N2A-222,**
**IRVING, TX 75063 (Assignor)** by these presents does assign, and set over, without recourse, to **SELENE FINANCE, LP**
**9990 RICHMOND AVE, STE 400 SOUTH, HOUSTON, TX 77042 (Assignee)** the described mortgage with all interest, all
liens, any rights due or to become due thereon, executed by **CAPRICE LADSON, A MARRIED WOMAN AND**
**CHIBUEZE C.** to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., (MERS) AS NOMINEE FOR QUICKEN
LOANS, INC., ITS SUCCESSORS AND ASSIGNS.   Said mortgage **Dated: 3/23/2005** is recorded in the **State of NJ, County**
**of Union on 4/19/2005, as Book M11122 Page 0501 Instrument 353102 AMOUNT: $ 251,200.00**          Property Address:
688 SHERIDAN AVENUE, PLAINFIELD, NJ 07060
IN WITNESS WHEREOF, the Undersigned Corporation has caused this instrument to be executed as a sealed instrument by its
proper officer.  Executed on: 06/27/2011
CITIMORTGAGE, INC.

By:          _M. E. Wileman_

          M. E. Wileman, Authorized Signator

State of Texas, County of Tarrant
On 06/27/2011, before me, the undersigned, personally appeared M. E. Wileman, who acknowledged that he/she was
authorized to and did execute this instrument as Authorized Signator of/for  CITIMORTGAGE, INC. and that he/she executed
this instrument as the act of the entity named in this instrument and such execution was done as the free act and deed of
CITIMORTGAGE, INC. .



C. LAFFERTY
MY COMMISSION EXPIRES
November 30, 2014

          _C. Lafferty_

          Notary public, C. Lafferty
          My commission expires: November 30, 2014

          NJ   Union                          SELENE/EMER/ASMT

**WHEN RECORDED MAIL TO:**
*PHELAN HALLINAN & SCHMIEG*
*400 Fellowship Road*
*Suite 100*
*Mt. Laurel, NJ 08054*



Received & Recorded   Assignments-4 True
Union County, NJ      Inst# 1048682
12/20/2010 14:30       Certified Correct Copy
**Joanne Rajoppi**    Cons.Correct Copy, Skillon, Esquire
**County Clerk**       Page.......... .00
Operator              .00
ALLISON

## ASSIGNMENT OF MORTGAGE

10·26·10

FOR VALUE RECEIVED, the undersigned, as beneficiary or successor thereto
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as nominee for QUICKEN LOANS INC., its
successors and assigns, a Delaware corporation, whose address is c/o CitiMortgage, Inc., 1000 Technology Drive,
O'Fallon, MO 63368-2240, hereby grants, conveys, assigns and transfers unto CitiMortgage Inc., whose
address is 1000 Technology Drive, O'Fallon, MO 63368-2240, it's successors and assigns, all beneficial
interest under that certain Mortgage dated MARCH 23, 2005. Said Mortgage is recorded in the
State of New Jersey, County of UNION

**Mortgage Recorded: 4/19/05**
**Original Mortgage Company:** *Mortgage Electronic Registration Systems, Inc., as nominee for*
*QUICKEN LOANS INC.* ITS SUCCESSORS AND ASSIGNS ~~OBT~~
**Original Mortgagors:** *CAPRICE LADSON AND CHIBUEZE C O̶B̶I̶I̶I̶E̶R̶*
**Original Loan Amount:** $ 251,200.00
**Book:** *11122*
**Page:** *0501*
**Property Address:** *688 SHERIDAN AVE, PLAINFIELD, NJ 07060*

**TOGETHER** with the Bond, Note, or other Obligation therein described or referred to,
and the money due and to become due thereon, with the interest.

**TO HAVE AND TO HOLD** the same unto the said Assignee, its successor and assigns,
forever subject only to all the provisions contained in the said Mortgage and the Bond, Note or
other Obligation. And the said Assignor hereby constitutes and appoints the Assignee as the
Assignor's true and lawful attorney, irrevocable in law or in equity, in the Assignor's name, place
and stead but at the Assignee's cost and expense to have, use and take all lawful ways and means
for the recovery of all the said money and interest; and in case of payment, to discharge the same
as fully as the Assignor might or could do if these presents were not made.

AB1387-0832

*I AGREE TO THE TERMS OF THIS ASSIGNMENT.*

*Witnessed or Attested by:*

_____     _____ *(Seal)*
Witness                                        Aaron Menne, Assistant Secretary

## *NOTARY ACKNOWLEDGMENT*

*CAPACITY CLAIMED BY SIGNER:  Assistant Secretary*

*OF* MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., as nominee for
QUICKEN LOANS INC. ITS SUCCESSORS AND ASSIGNS

PD BY JAHC LLC

*STATE OF MISSOURI*
*COUNTY OF ST CHARLES*

On, this _____OCT 2 6 2010_____, before me, __Dennis J Luecke____, a Notary Public,
personally appeared Aaron Menne, who proved to me on the basis of satisfactory evidence to be
the person whose name is subscribed to the within instrument and acknowledged that he/she
executed the same in her authorized capacity and that by her signature on the instrument, the
entity upon behalf of which the person acted executed the instrument.

*WITNESS my hand and official seal.*

_____
Notary Public

PHELAN HALLINAN & SCHMIEG LLP
1 PENN CENTER@SUBURBAN STATION
1617 JFK BLVD STE 1400
PHILADELPHIA          PA 19103-9897

Assignments

| | |
|---|---|
| Inst.# | 142682 |
| Paid | |
| Recording Fee | 50.00 |
| RT Fee | .00 |

DENNIS J. LUECKE
Notary Public - Notary Seal
State of Missouri
St. Charles County
Commission #08672763
My Commission Expires 11/04/2012

END OF DOCUMENT

AB1387-0833

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Case No.: _____

Chapter: _____

In Re:

Adv. No.: _____

Hearing Date: _____

Judge: _____

## CERTIFICATION OF SERVICE

1.  I, _____ :

    ☐ represent _____ in the this matter.

    ☐ am the secretary/paralegal for _____, who represents
    _____ in the this matter.

    ☐ am the _____ in the this case and am representing myself.

2.      On _____, I sent a copy of the following pleadings and/or documents
    to the parties listed in the chart below.

3.      I certify under penalty of perjury that the above documents were sent using the mode of service
    indicated.

Date: _____        _____
                                                        Signature

| Name and Address of Party Served | Relationship of Party to the Case | Mode of Service |
|---|---|---|
| | | ☐ Hand-delivered<br>☐ Regular mail<br>☐ Certified mail/RR<br>☐ E-mail<br>☐ Notice of Electronic Filing (NEF)<br>☐ Other _____<br>   (as authorized by the court *) |
| | | ☐ Hand-delivered<br>☐ Regular mail<br>☐ Certified mail/RR<br>☐ E-mail<br>☐ Notice of Electronic Filing (NEF)<br>☐ Other _____<br>   (as authorized by the court *) |
| | | ☐ Hand-delivered<br>☐ Regular mail<br>☐ Certified mail/RR<br>☐ E-mail<br>☐ Notice of Electronic Filing (NEF)<br>☐ Other _____<br>   (as authorized by the court *) |
| | | ☐ Hand-delivered<br>☐ Regular mail<br>☐ Certified mail/RR<br>☐ E-mail<br>☐ Notice of Electronic Filing (NEF)<br>☐ Other _____<br>   (as authorized by the court *) |

| Name and Address of Party Served | Relationship of Party to the Case | Mode of Service |
|---|---|---|
| | | ☐ Hand-delivered<br><br>☐ Regular mail<br><br>☐ Certified mail/RR<br><br>☐ E-mail<br><br>☐ Notice of Electronic Filing (NEF)<br><br>☐ Other _____<br>   (as authorized by the court *) |
| | | ☐ Hand-delivered<br><br>☐ Regular mail<br><br>☐ Certified mail/RR<br><br>☐ E-mail<br><br>☐ Notice of Electronic Filing (NEF)<br><br>☐ Other _____<br>   (as authorized by the court *) |
| | | ☐ Hand-delivered<br><br>☐ Regular mail<br><br>☐ Certified mail/RR<br><br>☐ E-mail<br><br>☐ Notice of Electronic Filing (NEF)<br><br>☐ Other _____<br>   (as authorized by the court *) |
| | | ☐ Hand-delivered<br><br>☐ Regular mail<br><br>☐ Certified mail/RR<br><br>☐ E-mail<br><br>☐ Notice of Electronic Filing (NEF)<br><br>☐ Other _____<br>   (as authorized by the court *) |

| Name and Address of Party Served | Relationship of Party to the Case | Mode of Service |
|---|---|---|
| | | ☐ Hand-delivered<br><br>☐ Regular mail<br><br>☐ Certified mail/RR<br><br>☐ E-mail<br><br>☐ Notice of Electronic Filing (NEF)<br><br>☐ Other _____<br>   (as authorized by the court *) |
| | | ☐ Hand-delivered<br><br>☐ Regular mail<br><br>☐ Certified mail/RR<br><br>☐ E-mail<br><br>☐ Notice of Electronic Filing (NEF)<br><br>☐ Other _____<br>   (as authorized by the court *) |
| | | ☐ Hand-delivered<br><br>☐ Regular mail<br><br>☐ Certified mail/RR<br><br>☐ E-mail<br><br>☐ Notice of Electronic Filing (NEF)<br><br>☐ Other _____<br>   (as authorized by the court *) |
| | | ☐ Hand-delivered<br><br>☐ Regular mail<br><br>☐ Certified mail/RR<br><br>☐ E-mail<br><br>☐ Notice of Electronic Filing (NEF)<br><br>☐ Other _____<br>   (as authorized by the court *) |

* May account for service by fax or other means as authorized by the court through the issuance of an Order Shortening Time.

*rev.8/1/15*